STATE v. JOHN KLYM.[1]

December 2, 1938.

No. 31,852.

[1]Reported in 282 N. W. 655.

M. J. *Hegland* and *Grady & Grady,* for appellant.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, and *R. J. Knutson,* County Attorney, for the State.

LORING, JUSTICE.

The defendant was convicted of murder in the second degree and comes here upon appeal from an order denying a new trial.

The homicide occurred on the afternoon of June 23, 1937, about 35 feet south of the international boundary line in Roseau county, Minnesota. Both the defendant and the man who was killed were Austrians who had emigrated to Canada and resided just north of the international boundary. Between their two farms lay an unimproved right of way for a highway, which in Canada appears to be called an "allowance." That part of the allowance which was on the Klym side of the center line thereof Klym had cleared and sowed to timothy. A survey made after the homicide indicated that he had cleared a few feet beyond the center line and also to the south beyond the international boundary. Along the east side of the allowance he had dug a shallow drainage ditch. Bad blood between the families had given rise to threats by Mandzuik, the man who was killed, to take Klym's life and that of his son. In the forenoon of the day of the homicide, George Klym, the defendant's 18-year old son, had mowed the grass along the easterly side of the allowance and had encroached on the westerly side of the center line seven or eight feet. He mowed a strip about 300 feet long and approximately 23 feet in width extending south of the international boundary line about 50 feet. There was nothing to indicate either the international boundary line or the center line of the allowance. George testified that he believed that he was mowing only on the easterly side of the center line. George finished cutting about noon and went to his father's house for dinner, intending to rake the hay on the following day. Mandzuik saw that the hay had been cut and, with the intention of getting possession of it, sought the help of one of his neighbors, John Nastuik. Mandzuik

did not care for the hay himself but proposed giving it to Nastuik. He did not want Klym to have it. Nastuik endeavored to dissuade Mandzuik from taking the hay, but Mandzuik hitched his team to his hay rake, took his pitchfork, gave Nastuik another pitchfork, and with Nastuik proceeded along the allowance to the south. When he had raked to the extreme south end of the strip which George had cut, Mandzuik went home for his wagon and told Nastuik to pile the hay on the west side of the road reservation.

In the meantime Mandzuik's activities had been observed by the Klyms, who in turn hitched their team to a wagon and proceeded to the hayfield. Klym put his loaded shotgun in the back end of the wagon, not, as he testified, for the purpose of using it against Mandzuik, but for the purpose of dissuading Mandzuik from assaulting him. When the Klyms arrived in the hayfield Nastuik was alone, and the defendant told him that he, Nastuik, had no right to meddle with Klym's hay and that he should go home. The Klyms drove their wagon to the extreme southerly end of the strip and there turned the wagon around to face north. They brought it to a stop on the east side of a small bunch of hay piled near the extreme southerly end of the mowed strip. There was only about one forkful of hay in this small pile. Defendant began picking it up on his pitchfork. In the meantime Mandzuik drove hurriedly after the defendant's wagon yelling at defendant and stopped his wagon on the west side of the small pile of hay. He gave Nastuik the reins and immediately, with pitchfork in hand, jumped from his wagon and using the pitchfork took the hay from Klym's fork and endeavored to pitch it into the Mandzuik wagon. Nastuik stayed on the Mandzuik wagon, and George Klym stayed on the Klym wagon. The two wagons were about 10 or 12 feet apart. According to the witnesses, both Mandzuik and Klym threatened shooting and were very angry and yelling at each other in the Ukranian language. Nastuik testified that both Klym and Mandzuik were at the rear of the Klym wagon where the Klym gun was plainly visible to both of them. There was evidence tending to prove that Mandzuik charged toward Klym with his pitchfork held in a threatening manner. Klym retreated toward his wagon pursued by Mandzuik, seized the gun, and

still retreating backed toward the ditch and nearly fell into it. It was at this point that the gun discharged and the charge of shot went into Mandzuik's right leg about four inches above the knee and almost completely severed the main artery. It was some distance to a hospital, and Mandzuik died a few hours after his arrival there.

The trial court submitted the case to the jury upon the theory that they might find the defendant guilty of murder in the first or second degree or that the homicide was justifiable. It refused to submit to the jury the question of whether or not the defendant was guilty of manslaughter in the first degree. The court charged:

"The law does not permit the taking of a human life to repel a mere trespass as in this case. The use of a deadly weapon such as a loaded shotgun to repel the taking of the hay in dispute would be unlawful and wrongful. The provocation given by Mandzuik by his appropriating the hay which had been cut by the defendant Klym was not such as the law will recognize as sufficient to justify the use of the gun to prevent the taking of the hay."

To the quoted part of the charge the defendant's counsel took exception.

■ We think the trial court overlooked the fact that there was evidence tending to prove that at the time the shot was fired the defendant was being chased by Mandzuik with a pitchfork. 2 Mason Minn. St. 1927, § 10075, provides:

"Such homicide is manslaughter in the first degree when committed without a design to effect death, either * * *

"2. In the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; * * *"

From the evidence of the defendant and from the inferences which may be drawn from the character of the wound and the circumstances under which it was inflicted, we think that the jury might have concluded that the homicide was committed without a design to effect the death of Mandzuik and that the court should have submitted the question of whether the defendant was guilty of manslaughter in the first degree.

■ Complaint is made that the court did not adequately cover in its charge the law of self-defense. No requests to charge were made, and it is fair to assume that upon another trial upon appropriate request the court will adequately cover the subject.

We think it was error for the court to charge as it did in the quoted part of the charge: "The law does not permit the taking of a human life to repel a mere trespass *as in this case.*" This was in effect telling the jury that the law of self-defense was not applicable and that the conduct of Mandzuik amounted to a mere trespass, ignoring entirely the assault with the pitchfork.

The order is reversed and a new trial granted.

